# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### 3:11cv180

| | | |
|---|---|---|
| VICENTE A. PIEDI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM** |
| Vs. | ) | **OF DECISION** |
| | ) | |
| T-MOBILE USA, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** is before the court on defendant T-Mobile USA, Inc.'s Motion for Summary Judgment (#17), plaintiff Vicente A. Piedi's Response in Opposition (#23), and defendant's Reply (#24). Having carefully considered such motion, the memoranda of law, and evidentiary materials submitted, and having conducted a hearing on the motion, the court enters the following findings, conclusions, and Order denying the motion for the reasons provided.

## FINDINGS AND CONCLUSIONS

### I. Background

Plaintiff contends that his employment was wrongfully terminated based on his Hispanic race and has filed a Title VII action and a similar state law claim for wrongful discharge. Plaintiff was born in Honduras to a Honduran mother and a Spanish father.

In late 2009, Plaintiff placed an unauthorized, internal order to activate new lines of service equipment, at the request of a co-worker who worked closely with plaintiff, and with the approval of their supervisor. Plaintiff and his co-workers had been wooing a potential client for months and hoped to close the deal prior to the holidays. When defendant learned of the transaction, its management team first terminated the supervisor, then terminated

-1-

plaintiff weeks later upon his return from vacation, but did not terminate the other employee. Both other employees are Caucasian.

## II.    Undisputed Facts

### A.    Plaintiff's Employment History with Defendant

Defendant is a nationwide provider of cellular telephones and data services. Declaration of Lauren M. Johnson, ¶ 2.  Plaintiff was employed by defendant from February 13, 2004, through January 4, 2010.  Complaint, ¶¶ 5, 19.  He was initially hired as an Account Executive, and consistently reached his performance goals and quotas, Deposition of Plaintiff, p. 75, and accordingly was promoted several times, eventually reaching the status of National Account Manager ("NAM"), where his sales earned him recognition in the elite "Winner's Circle" for two years, Complaint, p. 2.  In 2009, as a NAM, plaintiff made direct sales pitches to large companies with 2000 or more employees, Johnson Decl., ¶¶ 3-4, and plaintiff was expected to generate clients through a "100-point day," in which he would make 40 phone calls in the morning with the goal of setting two appointments, and by knocking on 40 doors in the afternoon, with the goal of having two meetings.  Pl. Dep., pp. 67-69.  Plaintiff received a base salary and a monthly-sales based commission.  Johnson Decl., ¶ 5.  Sales to such customers could last weeks or months and typically had a longer "sales cycle."  Id., ¶ 6; Pl. Dep., p. 125.  A NAM would frequently try to negotiate contracts with larger companies, which might have more technological challenges.  Pl. Dep., pp. 121-22.

In approximately August of 2008, plaintiff requested to be transferred to a New Jersey office for "[b]etter opportunity" in larger markets and for personal reasons.  Pl. Dep. pp. 85, 88-89.  Plaintiff later interviewed to transfer to the Charlotte market, which presented substantial growth opportunities, because defendant had purchased a company there with

$1.8 billion in assets. Id., p. 90. Plaintiff interviewed with a three-member panel including D. Stewart Leckie, who was then a senior sales manager for Georgia. Id., p. 91. Leckie told plaintiff of his plan "to take over the leadership in North and South Carolina and that he wanted [plaintiff] to be the first hire on his team." Id., p. 94. Leckie became plaintiff's direct supervisor.

**B.    Relationship Between Plaintiff and Hooks**

David Hooks previously worked for a competitor of defendant, and was hired by defendant as a NAM in late 2008. Pl. Dep., pp. 103, 119. Both plaintiff and Hooks reported to Leckie, who reported to Southeast Regional Director Peter Klinges, who reported to East Coast Division Director Frank Sickinger, who reported to another supervisor. Id., p. 103; Johnson Decl., ¶ 17. Plaintiff testified that he had the most interaction in the office with Hooks, in part because Leckie asked plaintiff to guide Hooks based on plaintiff's years of experience. Id., p. 119. In order to close deals with clients in a new market, plaintiff and Hooks partnered on accounts between 90 and 99 percent of the time. Pl. Dep., pp. 141, 143, 145. Plaintiff said "that was the nature of our business . . . I would hunt. He would farm." Id., p. 140. Plaintiff provided the initial "ice-breaker" with the potential customer and developed the relationship, and Hooks provided "postsales support." Id., pp. 140-41. Plaintiff would cater to "very technical" clients and establish technical support, billing support, and conflict resolution. Id., p. 142. Plaintiff and Hooks had a professional relationship but not a personal relationship, although they did celebrate closing an important deal by going to dinner. Id., pp. 146-47.

**C.    DAK Transaction and Investigation**

In approximately August or September of 2009, Plaintiff obtained a meeting with a prospective customer, DAK Americas ("DAK"). Pl. Dep., p. 181. After the meeting, Hooks

asked to become the lead on the account "because he didn't feel like he had been pulling his weight." Id., p. 188. Hooks presented the account as one of his top five accounts at a regional meeting in November. Id., p. 281. However, DAK still had not signed an agreement with defendant, and Hooks and plaintiff's supervisor were concerned that their team was below its sales quota. See Response, p. 9. At that point, plaintiff's sales exceeded his quota, although it appears that Leckie and Hooks had not met their quota. See id. On November 27, 2009, Regional Director Klinges, who directly supervised Leckie, emailed Leckie, Hooks, and plaintiff and said "Please confirm that . . . the team is not going to perform to less than 10% of the team forecast." Klinges Email, attached as Def. Exh. 23. While Hooks was on vacation, Hooks asked plaintiff to submit an order without DAK's signature. Pl. Dep, p. 236. Plaintiff pointed out that the order would be returned without DAK's signature, id., p. 235, but reviewed the matter with Leckie and received his approval to do so, id., p. 236.

Defendant's procedures required that a new customer authorize a written order or email defendant to confirm a sale. Johnson Decl., ¶ 7. Defendant's "Field Support Manual" states that "[o]rders that do not meet processing standards i.e. incomplete, missing customer signatures, e-mail validation, and/or proper approvals for non-standard offerings will be returned for corrections." Field Support Manual, attached as Def. Exh. 9, p. 25. Plaintiff understood the policy to mean that if the order "doesn't meet some of the basic requirements of that order, then it doesn't get activated." Pl. Dep., p. 130. Accordingly, plaintiff believed that the order would simply be returned unprocessed from the legal department. Id., pp. 235, 238. The order, however, was processed.

In December, 2009, Human Resources Manager Lauren Johnson learned of the unauthorized order and, along with Sickinger and Klinges, began a week-long investigation

of the DAK transaction, interviewing, among others, plaintiff, Hooks, and Leckie. Johnson Decl., ¶¶ 1, 13-14. Johnson states that she conducted an in-person interview with plaintiff, id., ¶¶ 14-15, although plaintiff recalls only having a telephone conversation with either Johnson or her supervisor, Pl. Dep., p. 256. During the conversation, Plaintiff acknowledged that he sent an email which activated the DAK account, as instructed by Leckie, knowing that the order violated defendant's policy, id., ¶ 15, but believing that the incomplete order would not be processed, Pl. Dep., p. 270.

Johnson, Klinges, and Sickinger universally agreed that Leckie should be terminated. Johnson Decl., ¶ 18. With regard to plaintiff, Johnson and Klinges recommended that he be disciplined, specifically "written up for a formal reminder of business ethics," but not terminated. Id., ¶ 19; Klinges Email, attached as Def. Exh. A. According to Johnson, Sickinger concluded that plaintiff's employment should be terminated based upon his prior disciplinary record and because he submitted the unauthorized transaction, effectively overruling the recommendations of Johnson and Klinges. Johnson Decl., ¶ 19. Defendant also indicated that the final termination decisions were made in conjunction by Sickinger, Klinges, and Johnson. Letter to EEOC, attached as Pl. Exh. D, pp. 3-4. Plaintiff unsuccessfully requested an exit interview with Klinges. Pl. Dep., p. 340. No deal with DAK was finalized.

With respect to Hooks, who had no prior disciplinary record with defendant, Klinges recommended a written reminder, based upon his role in the transaction and the compensation he received for it. Klinges Email, Def. Exh. A. Johnson further noted that Hooks did not submit the account. Id.; Johnson Decl. ¶ 20. The decisionmakers ultimately disciplined Hooks with a "Decision Time" which is described as "akin to a final written warning." Letter to EEOC, p. 4.

**D.     EEOC Claim**

Following the termination, plaintiff filed a complaint with the United States Equal Employment Opportunity Commission on January 25, 2010, alleging that he was discriminated against based upon his race/national origin.  See EEOC File, p. 54.  Defendant responded to the complaint on March 29, 2010.  Id., p. 57.  On January 26, 2011, the EEOC filed a dismissal and notice of rights and issued a right to sue letter.  Id., p. 48.

**II.    Analysis**

**A.     Summary Judgment Standard**

Defendant has moved for summary judgment.  Rule 56(a), Federal Rules of Civil Procedure, provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed.R.Civ.P. 56(a).  The rule goes on to provide procedures for responding to a Motion for Summary Judgment:

> **(c) Procedures.**
> **(1) Supporting Factual Positions.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
> **(2) Objection That a Fact Is Not Supported by Admissible Evidence.**  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
> **(3) Materials Not Cited.**  The court need consider only the

cited materials, but it may consider other materials in the record.
**(4) Affidavits or Declarations.** An affidavit or declaration used
to support or oppose a motion must be made on personal
knowledge, set out facts that would be admissible in evidence,
and show that the affiant or declarant is competent to testify on
the matters stated.

Fed.R.Civ.P. 56(c).

On a motion for summary judgment, the moving party has the burden of production

to show that there are no genuine issues for trial. Upon the moving party's meeting that

burden, the non-moving party has the burden of persuasion to establish that there is a genuine

issue for trial.

When the moving party has carried its burden under Rule 56(c), its opponent
must do more than simply show that there is some metaphysical doubt as to the
material facts. In the language of the Rule, the nonmoving [sic] party must
come forward with "specific facts showing that there is a *genuine issue for
trial*." Where the record taken as a whole could not lead a rational trier of fact
to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)

(citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be

more than just a factual dispute; the fact in question must be material and readily identifiable

by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute

material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of

the suit under governing law will properly preclude the entry of summary judgment." Id.,

at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a

reasonable jury could return a verdict for the nonmoving party." Id. The court must credit

factual disputes in favor of the party resisting summary judgment and draw inferences

favorable to that party if the inferences are reasonable, however improbable they may seem.

Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a Motion

for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his favor. Anderson, supra, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252.

### B.    Racial Discrimination Under Title VII

Plaintiff alleges that defendant terminated his employment in violation of Title VII of the Civil Rights Act of 1964 and North Carolina public policy, based on the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. GEN. STAT. § 143-422.1, et al. Complaint, p. 8. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). The elements of proving racial discrimination are the same under Title VII and the NCEEPA. See Brewer v. Cabarrus Plastics, Inc.,146 N.C. App. 82, 85 (2001) (state claims of discrimination and retaliation are analyzed under federal law); see also N.C. Dep't of Corr. v. Gibson, 301 S.E.2d 78, 85 (N.C. 1983) (NCEEPA claims are evaluated under Title VII framework).

Plaintiff has not produced direct evidence that he was discriminated against. "In the employment context, direct evidence of discrimination is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." Johnson v. Mechanics & Farmers Bank, 309 F. App'x 675,

681 (4th Cir. 2009) (unpublished) (citations omitted).  Thus, without direct evidence of racial discrimination, the court must analyze plaintiff's claim under the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973).  <u>Bonds v. Leavitt</u>, 629 F.3d 369, 386 (4th Cir. 2011).  While the disparate discipline between plaintiff and Hooks suggests that this matter should be argued as a disparate discipline case, plaintiff's alleged disparate discipline was plaintiff's firing.  The Fourth Circuit has held that the *prima facie* case in discriminatory termination suits requires the plaintiff to show: (1) he is a member of a protected class; (2) he was discharged; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 802.

Once a plaintiff makes out his *prima facie* case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's [termination]."  <u>McDonnell Douglas</u>, 411 U.S. at 802.  "[O]nce an employer has met its burden of producing a legitimate nondiscriminatory explanation for its decision, the plaintiff is afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination.'"  <u>Dennis v. Columbia Colleton Medical Ctr., Inc.</u>, 290 F.3d 639, 646 (4th Cir. 2002) (quoting <u>Tex. Dep't. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)).

While not raised by the parties, in <u>Hill v. Lockheed Martin</u>, 354 F.3d 277 (4th Cir. 2004), the Fourth Circuit made clear that "Title VII . . . do[es] not limit the discrimination inquiry to the actions or statements of formal decisionmakers for the employer.  Such a construction of those discrimination statutes would thwart the very purposes of the acts by

allowing employers to insulate themselves from liability simply by hiding behind the blind approvals, albeit non-biased, of formal decisionmakers." 354 F.3d at 290 (citing <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151-52 (2000)). The court continued: "[i]n sum, to survive summary judgment, an aggrieved employee who rests a discrimination claim under Title VII or the ADEA upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer." <u>Id.</u>, p. 291.

## III. Discussion

Plaintiff contends that his race played a role in defendant's decision to terminate his employment, while a similarly situated, non-Hispanic Caucasian employee was not terminated. The court will address whether plaintiff meets the elements of a *prima facie* case.

### A. The First and Second Elements of a *Prima Facie* Case

The parties agree that plaintiff, of Hispanic origin, is a member of a protected class, and that he suffered an adverse employment action when his employment was terminated in 2010. Complaint, ¶¶ 19, 24. No evidence has been submitted that puts either of the first two elements in controversy.

### B. The Third Element of a *Prima Facie* Case

The parties disagree whether plaintiff was performing his job duties at a level that met defendant's legitimate expectations at the time of the adverse employment action, and each party raises the impact of two separate incidents. First, prior to being terminated, plaintiff received one written warning for violating company policy in 2005. Second, in May of 2009, Leckie emailed plaintiff and laid out his concerns with plaintiff's recent performance and

leadership potential by email.

With respect to plaintiff's written disciplinary action, plaintiff accepted 25 cellular handsets from a customer, rather than following company policy and instructing the customer to return the property directly to the manufacturer.  Corrective Action Form, attached as Def. Exh. 6.  Plaintiff first indicated that he mailed the handsets, but later admitted to giving the equipment to his girlfriend to return, which she did not do.  <u>Id.</u>  When plaintiff was asked about the whereabouts of the equipment, he promptly shipped the equipment to the manufacturer.  <u>Id.</u>  Plaintiff later testified that he and his sales partner, as newer employees, "weren't really aware" of the policy that the clients were to return their equipment on their own, and that plaintiff and his sales partner picked up the equipment and then attended the "Winner's Circle" award ceremony and "kind of forgot about it."  Pl. Dep., pp. 76-77.

In May of 2009, Leckie emailed plaintiff with performance concerns.  <u>See</u> Leckie Email, attached as Def. Exh. 11.  Leckie criticizes plaintiff for missing two "critical" meetings and says "I'm seeing too many 'exceptions' and I need you in line immediately." <u>Id.</u> at 5.  He adds that "[c]urrent leadership perceptions aren't good, and I will not continue to allow the cowboy activity to continue as my leadership comes into question as a result." <u>Id.</u>  Leckie also compliments plaintiff: "As a rep, you're a phenomenal talent, you really are . . ." and encourages him to "make the dynamic changes that will not only make you the best NAM in the market, but a leader for the southeast region."  <u>Id.</u>  Leckie concludes his email by saying "I know you have the talent . . . [B]ecome the winner that we all know you're capable of."  <u>Id.</u>  A copy of the email was placed in plaintiff's permanent file, although it is unclear if the email was intended to be a "formal" notice.  <u>See id.</u>  Defendant's Senior Corporate Counsel classified the email as a "Formal Reminder" which was "akin to a written warning" in a letter to the EEOC responding to plaintiff's claim.  Letter to EEOC, attached

as Pl. Exh. D, p. 3.

In response, Plaintiff has submitted two performance reviews, with the most recent covering the first six months of 2009. See Pl. Exhs. A, B. In that review, his overall performance rating was a 3.4 out of a possible 5.0, where a score of "3" indicates that he "achieved expectations." Id., Exh. B.

The evidence provided by both parties shows that plaintiff routinely exceeded his sales quotas and was promoted several times throughout his employment. Plaintiff's supervisors had great expectations for plaintiff to become more of a leader within the company, and the evidence shows that plaintiff was asked to mentor Hooks due to plaintiff's experience working for defendant. Due to the passage of years with no disciplinary infractions, a reasonable inference could be drawn by a finder of fact that plaintiff's initial misconduct was a benign client accommodation and that he not only remedied the extant problem but conformed his conduct in accordance when confronted with the issue.

With respect to Leckie's email, it remains an issue of fact whether plaintiff failed to meet defendant's legitimate expectations. The email clearly lacks the formality of the prior written reprimand, as it did not require plaintiff's signature, nor is it clear whether the email was discussed with plaintiff or placed into his "permanent" file. Thus, based on plaintiff's most recent performance evaluation prior to termination and evidence that he had exceeded his sales quota during the period in which he was terminated, he appears to have met defendant's legitimate expectations. But for the improperly placed order, the defendant's own evidence indicates that plaintiff was a promising employee.

## C.    The Fourth Element of a *Prima Facie* Case

Taken in a light most favorable to plaintiff, the evidence that plaintiff was terminated but that Hooks, a non-Hispanic Caucasian, received only a warning raises a reasonable

inference that unlawful discrimination occurred. Defendant is correct that Leckie's employment was terminated, and that Leckie is a non-Hispanic Caucasian. But, it is clear that Leckie, in his supervisory role over plaintiff and Hooks, is not a fair comparator. Hooks, a similarly situated comparator, asked plaintiff to take charge of the DAK account and claimed it as his own at a company meeting, and then asked plaintiff to submit the order while Hooks was on vacation. While defendant has quite properly submitted evidence that Hooks had a cleaner employment record, plaintiff had worked for the company longer, and a reasonable finder of fact could weigh such evidence in determining whether race played a role in the decision to retain the Caucasian employee and fire the Hispanic employee for essentially the same misconduct. Thus, for the purposes of the instant motion, the court will deem that plaintiff has stated a *prima facie* case and the burden will shift to the defendant to articulate a legitimate, nondiscriminatory reason for the termination of plaintiff.

### D.    Defendant's Reason for Discharge

Defendant has set forth a legitimate, nondiscriminatory reason for terminating plaintiff. It is undisputed that plaintiff submitted the order knowing that it was in violation of company policy. Clearly, discharging an employee for what can be seen as dishonesty is a legitimate, nondiscriminatory reason.

### E.    Pretext

To rebut evidence of defendant's reasons for discharge, plaintiff must demonstrate that "as between [the discriminatory reason] and the defendant's explanation, [the discriminatory reason] was the more likely reason for the dismissal, or that employer's proffered explanation is simply unworthy of credence." Burns v. AAF-McQuay, Inc., 96 F.3d 728, 731 (4th Cir. 1996). Plaintiff has produced evidence that Hooks and Klinges made negative comments about him based upon his Hispanic race. First, he alleges that Hooks

frequently called him a "beaner" (a derogatory term typically directed toward Hispanics of Mexican heritage) on a frequent basis, Pl. Dep., pp. 286, 289, and that he reported the unwelcome behavior to his supervisor. id., p. 287. Plaintiff tolerated the behavior so he wouldn't "come across as a whiner," and wanted to project a personality consistent with what he was taught in sales training: to be "comfortable and very easy to be around." Id., p. 287. Eventually, Hooks began referring to himself and plaintiff as "Shrek and Donkey." Id., p. 290.

Plaintiff also claims that Klinges made numerous derogatory comments about plaintiff's heritage. During the November, 2009 meeting in which Hooks claimed responsibility for the DAK account, Klinges criticized plaintiff's emails as having a "flowery European writing style" and wanted to teach plaintiff "how to write like an American." Id., pp. 282-83. Plaintiff thought the comments were strange and somewhat offensive and believed that Leckie was similarly confused by the comments. Id., p. 282.

In support of plaintiff's claim, plaintiff has submitted the Declaration of Clayton Matthew Lewis ("Lewis"), who began working for defendant as a Senior Sales Manager in Charlotte for the "mid-market team." Lewis Decl., attached as Pl. Exh. C, p. 2. Lewis and plaintiff did not work together much, although they occasionally had casual conversations in the office. Pl. Dep., p. 109. When plaintiff was on paid time off during December 2009 (as a reward for exceeding his sales and performance goals), Lewis warned him: "You should come back. You have to watch your back." Id., pp. 112-13. According to Lewis, Klinges was "uneasily candid" about the "Enterprise" team, of which plaintiff was a member. Lewis Decl., p. 2. Klinges said that he knew of plaintiff "from his time in other markets" and "was careful at first to just say that he had heard that [plaintiff] was trouble." Id. In approximately early-to-mid November of 2009, Klinges told Lewis that plaintiff was a "'hot-headed

Latino' who didn't fit with a team of Enterprise-level sales executives." Id.

Under the standard set forth in Hill for comments made by decisionmakers, Klinges was closely involved with Sickinger and Johnson in the decision to terminate Leckie and plaintiff, but not Hooks. Klinges, at a minimum, had supervisory and disciplinary authority over plaintiff. Plaintiff's request to speak with Klinges at an exit interview, which was denied, is further evidence of Klinges's role as a decisionmaker.

Viewing the evidence in a light most favorable to plaintiff, plaintiff has presented evidence that defendant's stated reasons for terminating his employment could be found to be pretext for racial discrimination in violation of Title VII of the Civil Rights Act of 1964. While Defendant presented evidence that plaintiff and his supervisor were both lawfully discharged for their involvement in the unauthorized transaction, plaintiff has countered this evidence by submitting his performance reviews to show that he performed his job at a consistently high level. Finally, he has presented evidence that a key decisionmaker made numerous derogatory comments about plaintiff in relatively close temporal proximity to plaintiff's termination. Therefore, a genuine issue of material fact exists. Defendant's motion for summary judgment will be **DENIED**.

## ORDER

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment (#17), is **DENIED**, and the Clerk of Court is respectfully instructed to calendar this matter for trial.

Signed: July 23, 2012

Max O. Cogburn Jr.
United States District Judge